·(24 Misc. Rep. 125.)

## HELMES v. HELMES.

(Supreme Court, Special Term, Ulster County.   June 21, 1898.)

:DIVORCE—SETTING ASIDE DECREE FOR FRAUD.

A husband, to secure a divorce from his wife, confederated with others, who were to co-operate in leading the wife to commit adultery, and be witnesses. The scheme was carried out, and divorce proceedings instituted. The confederates induced the wife to withdraw her answer, and on default a decree of divorce was rendered on their testimony. The wife, discovering that she had been the victim of a conspiracy, moved to set the decree aside. *Held*, that the court, having power to vacate its decree for fraud, should grant the relief.

Action by Leslie H. Helmes against Urena C. Helmes.   On motion rto vacate a decree of divorce.   Sustained.

George Addington, for the motion.
Sanford & Sanford, opposed.

CLEARWATER, J.   The plaintiff and defendant were married at ·Catskill on the 18th of January, 1883.   They lived together at Albany, from that time until October, 1895, when they separated, the de-.fendant claims, because of the brutal conduct of her husband, and his .adultery.   They have one child, a girl, Olive, 13 years of age, who lives with her mother.   By the articles of separation the plaintiff paid to his wife $60 per month for the support of herself and child. Early in 1897, the plaintiff hired David Klugman, who described him-:self as "a private detective," to furnish evidence upon which he could obtain a divorce from his wife upon the ground of adultery.   Klug-:man hired George D. Emerson, another so-called "private detective," .of the city of New York, to aid him.   The latter went to Albany, .and was introduced by Klugman to the plaintiff at his place of business.   Emerson, who had never before heard of the defendant or her family, was told that she lived with her father, Joseph Keeler, at Cats-'kill; that her brother Newton, to whom her father was devotedly at-·tached, had died at Catskill in September, 1873, 24 years of age; that his death was a great shock to his father, who, after the lapse of ·more than 20 years, still talked of his son, and his deep affection for 'him; that Newton was a skillful penman and accomplished book-:keeper, attainments of which his father was very proud, and of which 'he was never weary of speaking.   Emerson returned to New York. He lived in Forty-Ninth street, but, securing some of the note paper ·of one of the Broadway hotels, wrote the following letter, which he ad-·dressed to the man who he knew had been dead for 24 years:

Hotel Imperial, Broadway & 22nd Street, New York.

New York, Jany. 22d, '97.

Mr. Newton D. Keeler: I hope you have not forgotten me. It is more than ·twenty years since I was in Catskill.   The other day I was looking over some very old papers, and among them I found your card.   It brought to my mind ·my boyhood days; the summer when my mother and I were at a hotel in C.; the Sunday we attended the Methodist church, and you so kindly invited me into your class in Sunday school.   No doubt you are married; have a good wife and children (?) now.   I hope so.   I have not married.   I was engaged ;to an estimable young lady, who died suddenly.   I am interested in the shoe

business,—manufacturing. I hope, if you ever come to N. Y. City, you will not fail to visit me. I shall be grateful if you come and accept of a pair of shoes in return for your kindness to me in C. Please let me hear from you.

Cordially yours, Geo. D. Emerson.

He then for the first time in his life visited Catskill, went to the post office, stated to the postmaster that he had learned since writing the letter that Newton Keeler was dead, got it, and on the Sunday following, from a hotel at Catskill, wrote this letter to the defendant's father:

Hotel Irving, Catskill, New York.

Sunday, Feby. 7, '97.

Mr. Keeler—Dear Sir: I was called to Hudson on business yesterday, and on my return stopped here. With much regret I learned that Newton died many years ago. I went to P. O. and explained to them that I had written a letter to him, and of course never would be called for. They gave it to me, and I send it inclosed to you that you may know what this all means. I shall be pleased to meet you at the Methodist church this morning, and invite you to take dinner with me here between one and two o'clock, as I shall have to return to N. Y. this p. m. I wish to talk with you. Hope you can read this. I only wish I could write as Newton used to when I met him. If you cannot come, will you kindly let me know.

Cordially yours, Geo. D. Emerson.

These letters he sent to the residence of Mr. Keeler, who, shortly after receiving them, went to the Methodist church, and asked the usher if any one had inquired for him. The usher designated Emerson, who was seated in a pew, as having done so. Mr. Keeler took a seat beside him, and both remained to the service, at the close of which the sacrament of the Lord's Supper was administered. Mr. Keeler, being a communicant, went to the altar to partake of the sacrament, and was followed by Emerson, who knelt at his side, and partook of it with him. He then invited Emerson to his house, introduced him to his daughter, the defendant, showed him Newton's portrait, and asked him if he recognized it. Emerson, with moistened eyes and a sob, said that he did. He was then shown the business account books kept by Newton during his life, and praised the distinctness of Newton's penmanship, to which he had referred in his letter. Returning to New York, he wrote, expressing his thanks for the courteous treatment he had received, and inviting Mr. Keeler and his family to call on him when they visited that city. He learned, among other things, that the defendant meant to attend the inauguration of the president on the 4th of March. As she was passing through New York on her way to Washington, he called upon her, and persuaded her to abandon her trip, and to go with him to Boston to see his mother (who, in fact, was dead), and it was arranged they should go on the steamer Pilgrim on the afternoon of March 6th. The plaintiff was immediately informed, and went to New York, met Emerson with four confederates at a law office near the corner of Franklin and Centre streets, and in the plaintiff's presence it was arranged that on the afternoon of March 6th Emerson should go to the hotel in Forty-Second street, at which the defendant was staying, go with her by street car to the wharf of the steamer Pilgrim at the foot of Murray street, and enter a stateroom with her. That the four confederates should be at the hotel to see them leave, and should then

go by the elevated railroad to the steamer, reaching there before they arrived, and see them enter a stateroom together. This arrangement was carried out. On the following morning the plaintiff procured a written statement from these persons of what they had seen, and, upon one of them saying to him that he had got his wife "dead to rights," the plaintiff said that would be "the end of her." Emerson told his confederates that the defendant and he would return to New York with the Pilgrim on the morning of March 9th, and arranged with them to be at the steamer to see them leave a stateroom together. They were there. On the next day but one, this action was begun by the service of a summons and verified complaint, the charge of adultery being predicated upon the defendant's relations with Emerson under the name of Gaylor, which it was arranged he should assume, and which he did assume. The plaintiff affirmatively alleged that the adultery was committed without his consent, connivance, privity, or procurement, and that he was ignorant of "Gaylor's" true name. The defendant answered, denying the allegations of adultery, and alleging that on the 5th day of August, 1896, and at various times and places, the plaintiff had committed adultery with two women, whom she named, and demanded as affirmative relief that a decree of divorce a vinculo be granted to her, and that she have the care, custody, and control of her child, with suitable provision for their permanent support. After the action was begun, the plaintiff wrote to Emerson, inviting him to dine with him in New York, an invitation which he accepted, and the plaintiff invited some of his friends to dine with and meet the man he alleges to be the seducer of his wife. Immediately after she was sued, the defendant tried to find Emerson, but for a long time was unable to do so. She wrote him, and received letters in reply, postmarked at Boston, expressing his sorrow at the bringing of the suit, and his sympathy for her parents. When she did find him, he said his mother had been sick in Boston, and that he had been in that city. He urged her not to defend the action, but to permit her husband to obtain his divorce without opposition, and subsequently wrote her to the same effect, saying:

"My mother has come to New York to visit me. I am glad to see her; always before, now more than ever. She has been talking to me to-day. Does not condemn you in the least, nor me. I have told her how much you and Olive are to me, and what nice people are your father and mother in the home and in the church. Now, dear, what I may say may not please you. I wish you would write to F. [her then counsel], and say you wish your case brought before a referee. Then there will be no scandal. Now, dear, you have seen enough of me to know that my not seeing you does not mean that I shall care, or even wish, to see any other woman. Do what I ask, dear. Beaten or victorious, Olive, you, and I shall go on to Boston, where we will be as welcome as one would wish."

A few days later she received another letter from him, saying:

"I hate to say it, but it looks to me as if F. was trying to advertise himself. I would not trust him in my sight or out of it. He is just trying to get money. Do not worry about my mother. She will admire you as she does others whom she feels are good to me."

Yielding to his urgent solicitation, and against the advice and repeated protests of her counsel, she withdrew her answer, and filed the following stipulation:

## Supreme Court, Albany County.

### Leslie H. Helmes, Plaintiff, against Urena C. Helmes, Defendant.

It is hereby stipulated and agreed that the defendant will withdraw her answer and amended answer to the complaint herein, and that the plaintiff will not have inserted in the judgment or decree herein any provision awarding him the custody of Olive Mary Helmes, the issue of the marriage of the parties hereto, and will not hereafter in this action or in any other action or proceeding claim the custody of the said child, or dispute the defendant's right thereto. That no action will ever be taken by the defendant to obtain support or maintenance for the said child from the plaintiff.

Sanford & Sanford, Attorneys for Plaintiff.<br>Friend, House & Grossman, Attorneys for Defendant.

The answer having been withdrawn, and the defendant being thus in default, the case was brought on before Mr. Justice Chester at the Albany special term of the 15th of June, 1897, and upon the testimony of Emerson's confederates as to what they had seen, the testimony of the plaintiff that he neither procured, connived at, was privy to, or consented to the adultery of his wife, and her stipulation withdrawing her answer, the decree of divorce which it is now sought to set aside was granted. Judge Chester was not, of course, aware of the corrupt methods which the plaintiff had pursued, for, had he been, the decree would never have been signed. Immediately upon the divorce being granted, Emerson ceased to write to the defendant, or to see her. It finally dawned upon her that she was the victim of a conspiracy, and after much time and effort she found Emerson, who cynically told her that he had no mother, that she had long been dead, that he had not been in Boston, but had had his letters to her sent to Boston, and mailed to her from that city, and that he had been paid something less than $200 for aiding her husband to get his divorce.

Our statute prohibits the granting of a divorce where the offense was committed by the procurement or with the connivance of the husband, on the principle well expressed in the ancient maxim of the common law, "Volenti non fit injuria," and also on the fundamental principle that where no wrong is done no redress is due. The statute is simply an adoption and re-enactment of the rules adopted and applied by the ecclesiastical courts in England, the practice and decisions of which, so far as applicable, have been adopted and followed by this court in this state. The rule in England, indeed, goes further, and holds that a husband who connives at or assents to adultery by his wife with one person shall be deemed as assenting to it with others, and will not be entitled to a divorce for a subsequent act of adultery with a different person. Sir William Scott (afterwards Lord Stowell), when dean of the arches, in Timmings v. Timmings, 3 Hagg. Ecc. 76; Lovering v. Lovering, Id. 85; Dr. Lushington in Stone v. Stone, 1 Rob. Ecc. 99. Marriage is not a mere personal relation, but a public institution, on the purity and integrity of which the welfare of society depends. For this reason it can only be dissolved on public grounds, never to suit the whims, caprice, or mere wishes of individuals; and it is the duty of the court to see that fraud and falsehood do not accomplish that which the law forbids. Procurement or connivance destroys all claim to

legal redress, for it would be absurd to permit a man to be relieved from the result of an injury which he was chiefly instrumental in causing himself. He must approach the altar of justice with pure hands if he expects redress from the courts because of the impurity of his wife. This man has forfeited all right to legal relief from his marital obligations because of the unchastity of his wife by his anxiety to have her polluted, for, however different and salutary may be the rule in ethics, in law it is as full and complete a legal defense to the wife as the most unequivocal contradiction of fact can be, that her husband was the author and accomplice of her offense, or that he deliberately pursued a train of conduct which led to her guilt, and which he foresaw and intended would lead to it; and for a man to lay, as this plaintiff did, a trap to induce his wife to commit adultery and be caught, is connivance and procurement of the most infamous sort.

I have examined with care the elaborate brief of the plaintiff's counsel. It is not, however, worth while to spend time in the citation of authorities or the discussion of precedents as to the power of the court to grant this motion. The supreme court, independently of any authority conferred by the Code or by statute, has the power to amend or vacate its own judgments, and its absolute power to annul any judgment or decree for fraud practiced in the procurement and concoction of the judgment itself is undoubted, and inheres in the very constitution of the court. Any attempted limitation upon this power would not for a moment be tolerated, for it is inconceivable that the highest court of original jurisdiction in a great commonwealth should permit its action to be paralyzed by rules which would result in a reversal of its functions, and convert an august tribunal for the administration of justice into an instrument of fraud and oppression. Any fact which clearly proves it to be against good conscience to permit a judgment to be executed, and of which the injured party was prevented by the fraud of his adversary, unmixed with fault or negligence of his own, from availing himself, will justify an application to the court for relief. The facts to which I have referred, if not practically undisputed, are abundantly established. Neither a fuller statement nor an elaborate discussion of all the nauseating details of the case is here necessary, as the whole matter must be the subject of a more formal investigation. It would, in truth, be difficult to present a stronger case for the intervention of the court. To permit so iniquitous a conspiracy to finally succeed would be monstrous, for it is evident that the court has been deceived and imposed upon by methods not only base, but hideously foul. The dignity of a judicial proceeding has been degraded, and the most solemn and sacred rite of the Christian faith blasphemously defiled, in the revolting effort to debauch this woman for the sole purpose of freeing this man from his marriage vow. The court would be derelict in its duty should it hesitate to act with drastic completeness.

The decree is vacated; the default opened; the stipulation set aside. The defendant, if it be thought necessary, may move to amend her answer so as to allege the procurement and connivance of the

plaintiff in bar of his suit. The issues, when finally framed, must be tried by a jury, and the defendant may apply for the allowance of a suitable counsel fee to enable her to defend the action.